Filed 3/15/16  P. v. Hultman CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D069311 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI1301890) |
| PAUL JAMES HULTMAN, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Bernardino County, Eric M. Nakta, Judge.  Affirmed.


Richard de la Sota, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

Paul James Hultman was convicted of one count of continuous sexual abuse of a child under the age of 14 years (count 1), two counts of committing a lewd act upon a child under the age of 14 years (counts 3 and 5), and one count of committing lewd or lascivious acts upon a child age 14 or 15 years (count 6). (Pen. Code,[1] §§ 288.5 subds. (a), (c)(1).) The jury returned a true finding on special allegations that Hultman was convicted of committing sexual offenses against more than one victim in the instant offense. (§ 667.61, subds. (b), (e)(4).) The trial court sentenced Hultman to three years on count 6, plus three consecutive terms of 15 years to life on counts 1, 3 and 5.

Hultman contends that the trial court erred by admitting evidence of child sexual abuse accommodation syndrome (CSAAS) and by allowing an unqualified witness to testify as an expert on CSAAS. He further contends that the trial court abused its discretion by admitting evidence of pornographic materials that were found on computer equipment in his home because the prosecutor did not provide discovery of the pornographic materials within the statutory time, and a continuance would have significantly delayed the trial. Hultman also argues that because other persons had access to the computers in his home, the admission of the pornographic materials was more prejudicial than probative. We find no error and affirm.

---

[1] Unless otherwise indicated, statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2013, the People filed an eight count felony complaint alleging that on or about June 2011 through February 2013, Hultman unlawfully engaged in the continuous sexual abuse of Shyann G. (count 1), who was under the age of 14 years. (§ 288.5, subd. (a).) The complaint further alleged that Hultman committed lewd and lascivious acts upon four other children: Dylan G. (count 2), Kylie S. (counts 3 and 4), Chelsea S. (counts 5 and 6), and Taylor D. (counts 7 and 8).[2] (§§ 288, subds. (a), (c)(1).) As a special circumstance, the People alleged that Hultman had been convicted in the instant case of committing a lewd and lascivious act upon a child under the age of 14 years as to more than one child (counts 1, 2, 3, 5 and 7). (§ 667.61, subds. (b), (e).)

The prosecution alleged that Hultman had befriended the victims by paying them to clean his home and do yard work, giving them access to his home, and by buying them candy, clothes and other items. He then demanded, and received, oral sex from Shyann, Kylie and Chelsea (collectively, the children), and paid them not to tell anyone. The computer equipment in Hultman's home contained anime[3] depicting young teenage girls engaging in sex acts, and also contained pornographic images of young women who looked as if they could be underage. The children did not immediately disclose the

_____

[2]    The jury acquitted Hultman on the counts involving Dylan and Taylor (counts 2, 7 and 8). For brevity, we omit their testimony from the factual background, except where it is relevant to the other counts.

[3]    Anime is "a style of animation originating in Japan that is characterized by stark colorful graphics depicting vibrant characters in action-filled plots, often with fantastic or futuristic themes." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 49, col. 2.)

3

abuse, which had been ongoing for more than a year. The prosecution intended to introduce expert testimony to show that it was not uncommon for child sexual abuse victims to delay disclosure or recant their initial disclosures. This pattern was known as CSAAS.

Prior to trial, Hultman filed a motion in limine to exclude testimony about CSAAS or, if the testimony was going to be admitted, to limit its scope. Hultman argued that delayed disclosure is consistent with both having been sexually abused and not having been sexually abused and, therefore, evidence about CSAAS would have little, if any, probative value. Hultman further contended that the likelihood of prejudice from admission of CSAAS testimony was significant because it was effectively a means to vouch for the credibility of the victim. The prosecutor responded that he wanted to use CSAAS to explain why the children delayed disclosing the sexual abuse for more than a year. Further, if any victim recanted his or her initial statements to the police during the trial, the expert would discuss CSAAS as it related to recantation. The court stated, "I think if [the prosecution] wants to do it, I got to let him do it. I don't know the way or reason why I would not allow him to do that."

Defense counsel argued that an expert witness on CSAAS should be a doctor or psychologist, not a detective. The prosecutor responded that he would not ask his expert witness, Detective Jason Frey, whether a victim was suffering from CSAAS. Instead, the expert would testify that recantation is not unusual in victims of child sexual abuse. Based on the evidence, the jury would decide whether CSAAS applied. The court said, "We're all on the same page, then." Defense counsel replied, "Right."

4

Hultman also sought to exclude pornographic material that was found on three computers and a separate hard drive in his residence. The San Bernardino County Sheriff's Department (Sheriff) seized the computer equipment in June 2013, at the time of Hultman's arrest. The Sheriff issued its report on January 30, 2014. On March 14, 2014, 10 days before the scheduled trial date, the prosecutor informed defense counsel about the existence of the material, which included 93,956 pages of new discovery. The People listed 10 pornographic photographs and 28 images of anime child pornography as trial exhibits, and provided defense counsel with copies of the proposed exhibits as well as a media disc containing the Sheriff's complete report. The parties agreed to postpone the trial from March 24 to April 1.

On April 1, at the hearing on the motion in limine, Hultman asked the court to exclude the evidence recovered from his computers. Defense counsel said that he had received the disc on March 21 and had not had time to have a forensic expert examine the material on the disc. The trial court offered to continue the trial but warned that if the case were continued, it would be returned to the assignment calendar and the court would withdraw all of its rulings to allow the case to be heard by any judge in the county. The trial court added that all of the courts had heavy caseloads, and that the court was not certain how soon a trial could be scheduled. After consulting with Hultman, defense counsel advised the court that his client did not want a continuance but instead wanted to proceed to trial.

With respect to the pornographic anime, the trial court allowed in evidence 26 exhibits from the hard drive, and two from a tower computer, saying "anime is anime is

5

anime." The trial court commented that the introduction of the photographs of actual pornography was more problematic because the prosecution's expert could not testify that the persons depicted in the photos were minors. The court asked the prosecutor to provide a good reason why the jury should have to view the pornographic material.

The prosecutor argued that the material was relevant to show the defendant's interest in girls who appeared to be of the same age and appearance as the victims in this case. Most of the cartoon images appeared to be of girls between the ages of nine to 15 years old engaging in sex acts. In addition, there were photographs of real people engaged in sex acts. Many of the females in those photos appeared to be under 18 years of age. Thus, the prosecutor maintained, the material was relevant to show Hultman's sexual interest in children. The trial court found that the probative value of the material outweighed its prejudicial effect, and allowed the prosecution to enter in evidence 10 pornographic photographs and 28 anime images.

At trial, the jury heard evidence that Eric G. and his wife[4] moved into the defendant's neighborhood in January 2009. Eric's daughter, Shyann, and son, Dylan, had friends who lived on the same street as Hultman. Hultman befriended Shyann and Dylan. He repaired their bicycles and paid them for doing yard work. He bought toys and food for them, and took them to the pool and the store.

Eric was uncomfortable about Hultman's relationship with his children, and became more concerned after Hultman gave Shyann a cell phone. In approximately

---

4       Eric's wife, who was Shyann and Dylan's stepmother, died in November 2012.

February 2013, Eric told Hultman to stay away from his children. He instructed his children not to go to Hultman's house. Eric testified that Shyann was acting "funny." She was withdrawn and secretive. In June, his son Dylan told him that he and Shyann were still seeing Hultman and that Hultman had given Shyann another cell phone and told her to hide it. Hultman was meeting them in a park. Dylan also told Eric that he and Shyann had watched pornography with Hultman. In June, Shyann told Eric's girlfriend, Michelle, that Hultman had said, "let me show you how to suck my dick," and that he would whisper "oh, beautiful[,] good girl" as she engaged in the act. Eric and Michelle went to Hultman's home to confront him. When Hultman fled, they contacted the police.

At the time of the trial, Shyann was 13 years old. Shyann testified that she did not remember what happened the first time she performed oral sex on Hultman. After reviewing her initial statement to the police, Shyann said that Hultman asked her to go to his room. He pushed her by her shoulder and said that he had been doing kind things for her and buying her things, and that she had to do something nice for him. He undid the button on his pajama pants. His penis was hard. Shyann said that Kylie and Chelsea had told her that he had made them suck his penis. Shyann performed oral sex on Hultman for about 30 minutes. He gave her $20. Shyann estimated that during the next year and a half, she performed oral sex on Hultman 10 times or fewer. He gave her $20 each time.

Shyann testified that on one occasion, she and Kylie were in Hultman's kitchen when they heard a funny noise coming from the guest bedroom. They peeked through a crack in the doorway and saw Chelsea and Hultman having sex on the bed. Hultman stopped when he realized that Shyann and Kylie were present. He told them not to say

7

anything and gave them each some money. On another occasion, Shyann walked in on Hultman while he was performing oral sex on Kylie and Chelsea.

Hultman gave Shyann an iPhone 4S, but Hultman took it back to the store. He gave her another cell phone shortly before the summer of 2013. Hultman occasionally showed her pornography. Shyann said that the women "kind of looked like [] teenager[s] but kind of looked like [] adult[s]," while the men appeared to be in their 20's and 30's.

Dylan testified that he usually stayed in the living room watching television or using the computer, or was outside watering the roses when Hultman and Shyann were alone in another room. Hultman would take Shyann into a bedroom almost every time they went to his house. Hultman gave Dylan toys and candy and paid him $5 or $10 to water the roses.

At trial, Kylie initially denied having had any sexual contact with Hultman. Kylie acknowledged that her sister, Chelsea, had told her that she had performed oral sex on Hultman and that he had paid her $20. During her testimony, Kylie became visibly upset and started to cry. After a recess, Kylie testified that she had told Shyann that Hultman had made her suck his penis. Kylie said that she performed oral sex on Hultman once. She was 13 years old at the time. On another occasion, Hultman tried to take her pants off. She told him no, but he took them off anyway and performed oral sex on her for 20 minutes. He paid her $20. Hultman tried to convince her to have sex with him. He said to her, "The other girls get fucked, so why don't you get fucked, too."

Kylie testified that she and Shyann were in the kitchen when they heard noises coming from the back bedroom. The bedroom door was partially open. Kylie and

8

Shyann saw Hultman and Chelsea having sex. Chelsea later told Kylie, "Don't tell mom what happened."

Chelsea testified that she met Hultman when she was walking her dogs. He was a cool person. Hultman paid her $10 to $20 to clean his house. She went to his home on Mondays, Tuesdays and Thursdays. Chelsea denied having had any sexual contact with Hultman. Chelsea said, "[Michelle] put us up to all of this, just to let you know." Chelsea maintained that Hultman had done nothing wrong.

The prosecution played Chelsea's initial interview with a police detective, in which she had stated that she had performed oral sex on Hultman approximately three times. Chelsea also said that she had had sex with Hultman and that he had not forced her to have sex with him. On one occasion, they were having sex when Shyann and Kylie walked into the room.

Detective Frey testified that he was assigned to the Crimes Against Children Detail with the Sheriff. Frey was completing his master's degree in counseling. He expected to graduate in May 2014. He had training and experience in child abuse cases and was familiar with CSAAS. It was presented as part of the forensic children interview training that he had received, and as part of his advanced officer training at the Rady Chadwick Center in 2012 and in 2013. Frey had attended conferences in which academics had discussed CSAAS, and was familiar with scholarly works about CSAAS. He had not applied CSAAS on a clinical level. His training was academic. Prior to this case, Frey had never testified about CSAAS.

9

Defense counsel objected to Frey testifying as an expert on CSAAS on the ground that he was not qualified to provide expert testimony on the subject. The trial court overruled the objection.

Frey testified that CSAAS is a combination of patterns that have been observed in sexually abused children. One pattern is a delayed, contradictory and unconvincing disclosure of sexual abuse. Another pattern is a complete retraction of the initial disclosure. There are five characteristics of CSAAS: secrecy, helplessness, delayed disclosure, entrapment and accommodation, and retraction. Frey acknowledged that CSAAS is not a diagnostic tool and does not help a professional to determine whether someone has in fact been molested.

Sheriff's detectives testified about seizing and examining the computer equipment found in Hultman's house. They acknowledged that they did not find anything related to child pornography. They found photographs of the victims on the same hard drive that contained pornographic anime. None of the photographs of the victims was provocative or abnormal.

The defense called Veronica Thomas, Ph.D., as its CSAAS expert. She testified that as a therapeutic approach, CSAAS can apply to some people who have been molested by someone they know. CSAAS has no relevance to a criminal investigation or to determine whether sexual molestation did or did not happen. Dr. Thomas explained that a person who has been sexually assaulted by a stranger is more likely to discuss the abuse than someone who has been sexually assaulted by a family member or friend.

10

Hultman testified that he met Shyann and Dylan after Thanksgiving in 2009 when they were going door to door begging for food. They showed up at his home the next day with a broken bicycle, which he fixed. Hultman said that the children looked like refugees. Their clothing was filthy. According to Hultman, Dylan and Shyann "adopted" him. He began buying clothing for them. Hultman said that the children's parents did not provide for them and that they lived in squalor and were neglected. Hultman considered calling child protective services. Instead, he spoke to Eric and Michelle about the conditions in the home. Michelle disliked him. According to Hultman, Eric and Michelle had substance abuse problems.

Hultman said that he liked having the children at his house. They were fun and silly and pulled him out of his depression. He maintained that he had not sexually abused anyone. He denied watching pornographic anime or viewing pornography. Hultman acknowledged that he had photographed the children at a park on June 8, 2013, and that he had uploaded those photographs from his camera to one of his computers.

The jury returned guilty verdicts on four of the eight counts, and returned a true finding on the special circumstances alleged in counts 1, 3 and 5. The trial court sentenced Hultman to three years on count 6, plus three consecutive terms of 15 years to life on counts 1, 3 and 5.

## DISCUSSION

### A. *Admissibility of CSAAS*

Relying on the trial court's statement that it had no choice but to admit CSAAS evidence, Hultman contends that the trial court failed to exercise its discretion to

11

determine the admissibility of testimony regarding CSAAS. Hultman further contends that the trial court abused its discretion by allowing Detective Frey to testify as an expert on CSAAS.

1. *The record shows that the trial court exercised its discretion in allowing limited testimony about CSAAS.*

Expert testimony on CSAAS is not admissible to prove that the sexual offense charged actually occurred. CSAAS testimony is admissible to target a specific "myth" or "misconception" suggested by the evidence. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394 (*Bowker*).) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust. Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings." (*Ibid*., citing *People v. Bledsoe* (1984) 36 Cal.3d 236, 247-248.) CSAAS evidence is also admissible to rehabilitate the alleged victim's credibility when the defendant suggests that the child's conduct after the incident, such as a delay in disclosing sexual abuse, is inconsistent with the child's claim of having been sexually abused. (*People v. Perez* (2010) 182 Cal.App.4th 231, 245.)

"Beyond the tailoring of the evidence itself, the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine

12

whether the victim's molestation claim is true. . . . The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Bowker, supra,* 203 Cal.App.3d at p. 394.)

We are not persuaded by Hultman's argument that the trial court's statements at the in limine hearing demonstrate that the court did not know that it had the discretion to exclude the CSAAS evidence and therefore abused its discretion when it denied his motion in limine to exclude such evidence. Contrary to Hultman's contention, the court's statement, "I think if [the prosecution] wants to do it, I got to let him do it. I don't know the way or reason why *I would not allow him to do that*," (italics added) shows that the court was aware that it was within the court's discretion to either allow or disallow the prosecutor to present the CSAAS evidence. Further, the court's remark that the prosecutor was entitled to introduce CSAAS evidence was made in the context of the prosecutor's explanation that he intended to introduce that evidence for a limited purpose—to explain why the children did not disclose the ongoing sexual abuse for more than a year and why a child may recant his or her initial statements alleging sexual abuse. The prosecutor explained that he would not ask the expert to render an opinion as to whether the child was suffering from CSAAS. Instead, the expert would testify that recantation is not unusual in victims of child sexual abuse. The trial court confirmed that the prosecutor's proposed limitations on the CSAAS testimony were acceptable.

The record shows that the trial court appropriately exercised its discretion in admitting limited CSAAS evidence. The court considered the facts of the case and acted within the legal principles governing the admissibility of CSAAS evidence. (See *People*

13

*v. Diaz* (2014) 227 Cal.App.4th 362, 377.) The CSAAS evidence was admitted *solely* for the purpose of showing that the victims' reactions were not inconsistent with having been sexually abused. (*Bowker*, *supra*, 203 Cal.App.3d at pp. 393-394.) The evidence was not admitted to prove that the children in fact had been sexually abused. Detective Frey and Dr. Thomas each testified that CSAAS should not be used to determine whether the victims' molestation claims are true. That determination was properly left to the jury.

  2. *Detective Frey was qualified to provide limited expert testimony about CSAAS*

  A person is qualified to testify as an expert if the person has "special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "The foundation required to establish the expert's qualifications is a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion. [Citations.] 'Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications.' " (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115.)

  The determination that a witness qualifies as an expert and the decision to admit expert testimony are within the discretion of the trial court and will not be disturbed without a showing of manifest abuse. (*People v. Mendoza* (2000) 24 Cal.4th 130, 177.) On review, error in determining a witness's qualifications as an expert will be found only

if the evidence shows that the witness clearly lacks qualification as an expert. (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1118.)

We reject the people's argument that any error in permitting Detective Frey to testify about CSAAS is harmless in view of Dr. Thomas's more extensive testimony on the subject. It is clear that the defense would not have called Dr. Thomas if the prosecution had not raised CSAAS as an issue. Nevertheless, on this record, we cannot conclude that the trial court abused its discretion in permitting Detective Frey to testify as a CSAAS expert.

Detective Frey did not clearly lack qualifications to testify about CSAAS. (See *People v. Hill*, *supra*, 191 Cal.App.4th at p. 1118.) Frey was assigned to the Crimes Against Children Detail with the Sheriff. The record permits the reasonable inference that in investigating allegations of child sexual abuse, Frey's duties included interviewing children who allegedly had been sexually abused. His forensic child interview training included instruction on CSAAS, which describes a variety of common reactions by children to sexual abuse by a family member or friend. In addition, Frey had attended academic conferences in which CSAAS was discussed, and was familiar with scholarly works about CSAAS. Frey did not offer any clinical observations about the victims. Rather, his testimony was limited to explaining the basic elements of CSAAS and dispelling any misconception on the part of the jury that a child's delayed disclosure or recantation means that the child was not sexually abused. (*Bowker*, *supra*, 203 Cal.App.3d at pp. 393-394.) We conclude that the trial court did not abuse its discretion when it ruled that Frey had "special knowledge, skill, experience, training or education

15

sufficient to qualify him as an expert on the subject to which his testimony relates."

(Evid. Code, § 720, subd. (a).)

B.   *Admissibility of pornographic material*

Hultman contends that the trial court abused its discretion by admitting in evidence pornographic material found on computer equipment in Hultman's home.  He argues that the trial court should have excluded the material as a sanction for the prosecutor's violation of Penal Code section 1054.1, and also because the material was more prejudicial than probative under Evidence Code section 352.

1.   *Timeliness*

Section 1054.1 imposes a duty upon the prosecuting attorney to disclose relevant material and information to the defendant or his or her attorney.  Those disclosures must be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted or deferred.  If the material and information becomes known to, or comes into the possession of, a prosecutor within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why disclosure should be denied, restricted or deferred.  "Good cause" is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence or possible compromise of other investigations by law enforcement.  (§ 1054.7.)

Upon a showing that a party has not complied with section 1054.1, a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter or

any other lawful order.  Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure.  (§ 1054.5.)

" 'It is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm.' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 950.)  Here, the Sheriff completed its high-tech crime analysis of the contents of Hultman's computers on January 30, 2013 (the report).  The prosecutor said that he was not aware of the report until late February or early March.  He did not want to mail the report, which was on a computer disc, to the defense because it was "full of child porn."  The prosecutor waited until the next hearing date on March 14 to inform defense counsel about the report and give him copies of the exhibits from the report that the prosecution intended to introduce in evidence at trial. The trial court observed that if the defense had known about the report, it could have sent someone to pick up the report.  The prosecutor acknowledged that he "messed up."

The trial court stated that the defendant was entitled to a continuance as a sanction for the late discovery.  The trial court also advised the defense that the courts were impacted and that the court would withdraw all of its rulings to allow the case to be heard by any judge in the county.  After a "thorough discussion" with Hultman, defense counsel advised the court that his client did not want a continuance and instead, wanted to proceed to trial.

It is axiomatic that "[t]he Constitution guarantees a criminal defendant both a speedy trial and effective representation, and it puts the burden of securing both guarantees on the state."  (*People v. Williams* (2013) 58 Cal.4th 197, 238.)  On this

record, we are not persuaded that the trial court impermissibly placed Hultman in an impossible position by making him choose between a speedy trial and effective representation of counsel. To the contrary, upon learning of the delayed discovery, the trial court immediately offered to continue the trial. The court also informed counsel that the court would withdraw all of its rulings in the case to allow the case to be heard by any trial court in the county. We draw the reasonable inference that the court was trying to secure another trial date for the defendant as soon as possible under the circumstances, and at an earlier date than would be available on the court's own calendar.

It is the defendant's burden to show that " 'the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 668.) Hultman decided to proceed to trial rather than accept the trial court's offer to continue the trial. On appeal, Hultman does not contend that he was prejudiced by the late discovery. Rather, he contends that this court should reverse the judgment as a consequence for the prosecutor's "habitually cavalier attitude towards discovery." Absent a showing of prejudice, we cannot conclude that the trial court abused its discretion by failing to exclude this evidence as a sanction for late discovery. (*Id*. at pp. 668-669.)

2.    *Evidence Code section 352*

Hultman argues that the pornographic material was more prejudicial than probative. He contends that there was insufficient evidence to show that he was responsible for the pornographic material that was found on his computer equipment and notes that the record shows that he did not have exclusive access to the computers in his

18

home, which were accessible to a series of roommates and the alleged victims. The children testified that they used the computers in his home. Hultman points out that there were no pornographic images in any of the password-protected computer files. Hultman argues that even if the material had some limited probative value, its admission was designed to suggest to the jury that he was a "pervert" or an antisocial adult male who prowled the internet for unsavory pictures of adult men having sexual relations with children. He maintains that this evidence was manifestly prejudicial and should have been excluded. Hultman contends that reversal of the judgment is required because in view of the children's conflicted and conflicting testimony, it is reasonably probable that an outcome more favorable to the defense would have occurred if the trial court had excluded the evidence. (*People v. Harris* (1998) 60 Cal.App.4th 727, 741; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

"The principles governing the admission of evidence are well settled. Only relevant evidence is admissible (Evid. Code, §§ 210, 350), 'and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute.' " (*People v. Harris* (2008) 37 Cal.4th 310, 337.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"A trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Scott* (2011) 52 Cal.4th 452, 490.) "Evidence is not prejudicial, as that term is used in a [Evidence Code] section 352 context, merely because it undermines the

19

opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant."  (*Ibid.*)  Evidence may be excluded under Evidence Code section 352 if it "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."  (*Id.* at p. 491.)  Evidence should be excluded as unduly prejudicial when " 'it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' "  (*Ibid*.)

On appeal, we review the trial court's ruling on the admissibility of evidence for abuse of discretion.  (*People v. Scott*, *supra*, 52 Cal.4th at p. 491.)  The trial court has broad discretion in determining relevant evidence.  (*People v. Harris*, *supra*, 37 Cal.4th at p. 337.)  "In certain circumstances, evidence of sexual images possessed by a defendant has been held admissible to prove his or her intent."  (*People v. Page* (2008) 44 Cal.4th 1, 40; see *People v. Memro* (1995) 11 Cal.4th 786, 865 [photographs of nude, young boys were admissible as probative of defendant's sexual attraction to young boys and intent to act on that attraction].)  The pornographic material found on computer equipment in Hultman's home showed older men engaging in sexual activities with younger women or girls, and was offered to show that Hultman had an interest in that type of sexual conduct. The trial court did not abuse its discretion when it concluded that the material was relevant to show Hultman's intent to commit lewd and lascivious acts with young teenage girls.  The pornographic images tend to corroborate Shyann's testimony that she viewed

20

pornography with Hultman. Shyann accurately described the images. She said that the women in the pornographic images "kind of looked like [] teenager[s] but kind of looked like [] adult[s]," while the men appeared to be in their 20's and 30's. We are also not persuaded by the argument that the material was not probative because other people had access to the computers in Hultman's home. The record shows that Hultman accessed the hard drive on which some of the pornographic evidence was located as recently as June 8, 2013, when he uploaded photographs of the children from his camera, and that he had control over the computers in his home.

Further, in view of the other evidence that supports the verdict, Hultman cannot establish that the admission of the pornographic material was prejudicial error. Shyann and Kylie testified that they were each under the age of 14 years when they performed oral sex on Hultman at his insistence. They each described hearing noises from a back bedroom when they were in the kitchen and discovering Chelsea and Hultman having sexual relations. In an interview with the Sheriff, Chelsea acknowledged that she and Hultman had had sexual relations and that Shyann and Kylie had walked in on them, and further acknowledged that she had performed oral sex on Hultman. Dylan confirmed that Hultman would take Shyann into a bedroom almost every time that they went to his house. In view of the ample evidence showing that Hultman sexually abused Shyann, Kylie and Chelsea, there is no reasonable probability that he would have achieved a more favorable result but for the admission of the pornographic material. (*People v. Page*, *supra*, 44 Cal. 4th at p. 46; *People v. Watson, supra,* 46 Cal.2d at p. 836.)

21

DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

McINTYRE, Acting P. J.

O'ROURKE, J.